## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN STERLING COLLINS,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **MARILYN L. CHRISTIE,** | : | |
| **executrix of estate of Edwin** | : | **NO. 06-4702** |
| **Lloyd, deceased, et al.,** | : | |
| **Defendants.** | : | |

### MEMORANDUM AND ORDER

**Stengel, J.**                                                                    **July 11, 2008**

John Collins alleges that defendants violated his federal civil rights, and committed the state law tort of malicious prosecution, as a result of events surrounding his September 24, 2004 arrest, his subsequent criminal trial, and his termination from employment with the Country Meadows Nursing Center in Bethlehem, Pennsylvania.[1] The defendants have filed motions for summary judgment.[2] For the reasons that follow, I will grant the motions of defendants Lipare and Country Meadows, and deny the motion of defendant Christie.

---

[1] I have already dismissed a number of counts in the plaintiff's Complaint. See Collins v. Christie, et al., No. 06-4702, 2007 U.S. Dist. LEXIS 61579 (E.D. Pa. Aug. 22, 2007) (dismissing Defendants Dr. Columbo and Lehigh Valley Hospital as parties; dismissing Count II (§ 1985 conspiracy), and the petition for attorney's fees in Count IX against Marilyn Christie).

[2] The following defendants have filed motions for summary judgment:
(1)     Detective Louis Scott Lipare, Document #75;
(2)     Marilyn Christie, personal representative of the estate of Edwin Lloyd, Document #80; and
(3)     George M. Leader Family Corp. t/a Country Meadows, Country Meadows Associates, LP, and Country Meadows Associates II, Document #77.

I.    **BACKGROUND**[3]

A.    Edwin Lloyd and the Sept. 24, 2004 Incident at Country Meadows

On September 24, 2004, plaintiff John Collins, an African American male, was

employed, in an at-will capacity, as a certified nurse's aide in the skilled care unit of the

Country Meadows Nursing Center, in Bethlehem, Pennsylvania.[4]  Mr. Collins is

approximately 6'5" and weighs 280 lbs.  Edwin Lloyd (deceased), then 92 years old, was a

resident of the skilled care unit of the Country Meadows Nursing Center, Building

Number V, and resided in Room 21.  Mr. Lloyd suffered from Alzheimer's and

Dementia.  At least one staff member at the Country Meadows facility described Mr.

Lloyd as "ornery," with "a history of being difficult with his orderlies."  (See Pl.'s Mat.

Facts ¶¶ 7-8; Country Meadows Resp. to Pl.'s Mat. Facts ¶ 8.)[5]   A nurse at Country

Meadows described Mr. Lloyd as "extremely combative," and stated that "on a daily

basis" Mr. Lloyd was liable "to fight you even when you were trying to clean him."  (See

---

[3]I have viewed the facts in the light most favorable to the plaintiff, as the non-moving
party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[4]George M. Leader Family Corp., t/a Country Meadows, Country Meadows Associates,
II, Country Meadows Associates, II, LP (hereinafter collectively, "County Meadows") refers to
an entity based in Hershey, Pennsylvania, which owns, operates and manages the Country
Meadows retirement and nursing home facility in Bethlehem, Pennsylvania where the described
events occurred.

[5]Both submissions make reference to Defendant Lipare's deposition.  (See Dep. of Lipare,
Jan. 3, 2008, Pl.'s Mat. Facts (hereinafter "1/3/08 Lipare Dep.").)  Lipare's investigation report
reflects that Barbara Lissenden, Assistant Director of Nursing, stated that "Lloyd does have a
history of being difficult with his orderlies and has swung at her in the past."  (See Country
Meadows Resp. to Pl.'s Mat. Facts, Ex. B (hereinafter, "Lipare Investigation Report").)

Deposition of Nurse Betty Jean Gunton, Jan. 11, 2008, Pl.'s Mat. Facts, Ex. D, 89:11-25 (hereinafter "Gunton Dep.").)   She testified that Mr. Lloyd used the derogatory term "nigger" monthly, if not more often.  (See id. 96:20-97:6; 98:8-99:6.)  Mr. Lloyd was also partially blind.  (See 1/3/08 Lipare Dep., 16:18-25.)

John Collins was working the 7:00 p.m. to 11:00 p.m. shift on the night of September 24, 2004, assigned to care for the residents of Room 21, including Edwin Lloyd.  Mr. Collins was the only male working the 7:00 p.m. to 11:00 p.m. shift in Building Number V at Country Meadows on September 24, 2004, and was wearing a name tag.  Mr. Lloyd's only roommate in Room 21, Building Number V, was "non-verbal" and "brain dead."

On the evening of September 24, 2004, John Collins transported Edwin Lloyd by wheelchair to Room 21 to prepare him for bed.  Mr. Lloyd was agitated.  At this point, all parties agree that an incident occurred and that Mr. Lloyd told Mr. Collins that "some guy named John" hit him.  (See Def. Christie Br. Ex. A, 129:6-130:17, Jan. 10, 2008 ("some guy named John"); Def. Christie Br., Ex. B, 32:21-33:6, Oct. 11, 2007 ("Some bastard named John hit me.").)  John Collins was the only "John" working in Building Number V at the time.  According to Mr. Lloyd, he and Mr. Collins had an argument, Mr. Collins spat in his face and punched him.  Mr. Collins denies hitting Lloyd and claims that Lloyd had begun acting strangely and that it was Lloyd who swung at him and hit him.  Plaintiff then left Mr. Lloyd's room.

B.    Country Meadows' Staff Observations

Several staff members at Country Meadows observed Mr. Lloyd throughout the night of September 24-25, 2004.  At 9:30 p.m. on September 24, 2004, after Mr. Collins left Mr. Lloyd's room, Nurse Tanya Rogers entered Lloyd's room.  Rogers found Lloyd alert and able to answer questions fairly well.  Lloyd became agitated and informed Rogers that a male aide had cursed at him and hit him in the chest.  Nurse Rogers gave Lloyd anti-anxiety medication (Ativan) and prepared an incident report.   Nurse Rogers' notes, recorded at 23:15 hours on September 24, 2004, indicate that no marks were noted on Mr. Lloyd, and that he did not exhibit breathing problems.  (See Dep. of Nurse Tanya Rogers, Jan. 21, 2008, Pl.'s Mat. Facts, Ex. G, 54:6-55:25 (hereinafter "Rogers Dep.").)  At around 11:30 to 11:45 p.m., Diana Sawruk, a registered nurse at Country Meadows, entered Mr. Lloyd's room.  Nurse Sawruk observed Mr. Lloyd to be alert.  (See Commonwealth v. Collins, July 13, 2005, N.T. 110:5-13; 127:15-22, Def. Country Meadows' Mat. Facts., Ex. F. (hereinafter "N.T. 7/13/05").)  She testified that Mr. Lloyd complained of chest pains generally when he moved his arms, and that someone named "John" had hit him.  (Id. 111:16-17, 112:13-18.)  Nurse Sawruk did not observe red marks on Mr. Lloyd's chest.  (Id. 111-122.)  She observed Mr. Lloyd three times during the night and found he was resting comfortably.  (Id. 114:7-12.)

At around 7:15 a.m. on September 25, 2004, Justine Reuben, a nurse's aide, observed Mr. Lloyd crying and screaming, and saw a purple area that stuck out in the

4

middle of his chest.  (See id. 15:19-25.)  Mr. Lloyd told Ms. Reuben that someone named

"John" had punched him in the chest.  (See id. 16:1-9.)  At around 8:00 to 8:15 a.m., a

nurse's aide named Madeline Velez entered Mr. Lloyd's room and observed that he was

able to communicate, was complaining of chest pain and that someone named "John" had

hit him, and that Mr. Lloyd had a "big red bruise" on his chest.  (See id. 35-43; 43:8.)

Linda Meyer, a licensed practical nurse, also entered Mr. Lloyd's room on the morning of

September 25, 2004, and found him in pain, covered in vomit, and complaining of being

punched in the chest by "John."  (See id. 67:1-7, 10-14; 67:19-68:3; 69:5-17.)

    Nurse Betty Jean Gunton began her shift at 6:45 a.m. on September 25, 2004.  At

that point, she learned from Diana Sawruk that Mr. Lloyd was punched in the chest.  She

went to check on Mr. Lloyd and he repeated his claim that "John" had punched him.

(See Lipare Investigation Report 11.)  Nurse Gunton stated that because of Lloyd's

allegation, she decided to perform a complete body check on him to assess his condition.

(See id.)  Justine Reuben and Madeline Velez then entered Mr. Lloyd's room to lift him

out of his recliner for the body check, when he began vomiting a dark substance.  (Id.)

According to Nurse Gunton, the only screams coming from Mr. Lloyd's room were from

the aides when Mr. Lloyd collapsed and began vomiting.  (Id.)  Nurse Gunton testified

that she was the first to document the red markings on Mr. Lloyd's chest, at 7:30 a.m. on

September 25, 2004.  (See N.T. 7/13/05 102:6-20.)   A nurse's note recorded at 9:30 a.m.

on September 25, 2004 states that Mr. Lloyd was suffering from petechiae rashes.  (See

Gunton Dep. 102:6-20; Rogers Dep. 84:15-24.)[6]  Petechiae rashes appear within an hour

or two if caused by trauma, are different from a bruise, and have several causes besides

trauma.  (See Gunton Dep. 94:4-95:19.)

C.    Emergency Room Transfer and Medical Evaluation of Mr. Lloyd

        After Mr. Lloyd collapsed, Country Meadows called for an ambulance to take Mr.

Lloyd to the Emergency Room.  (1/3/08 Lipare Dep. 48:24-50:5.)   Adam Columbo, D.O.

("Dr. Columbo") was working as an emergency medicine resident at the emergency room

of Lehigh Valley Hospital on the morning of September 25, 2004, and treated Mr. Lloyd.

Mr. Lloyd's first words were that "John" hit him.  (See N.T. 7/13/05, 110:5-13; 127:15-

22.)  Dr. Columbo observed that Mr. Lloyd was alert and lucid, and did not exhibit the

effects of Alzheimer's during the evaluation.  (See id. 198:18-21; 212:14-18.)  Dr.

Columbo observed that Mr. Lloyd "had some injuries to . . . the center of his chest. . . .

[He had] some abnormal lung sounds, and there was vomit present on his attire."  (Id.

199:16-19.)  Mr. Lloyd was having difficulty breathing, and his vomit was found through

tests to contain blood.  (See id. 200:15-18; 201:3-25.)  Based on his physical assessment,

Dr. Columbo concluded that Mr. Lloyd's injury was consistent with his account of being

hit in the chest.  (See id. 200:5-14.)  Given Mr. Lloyd's other medical conditions

(congestive heart failure and renal failure), Dr. Columbo believed his chest injuries were

---

        [6]Defendant Country Meadows notes that the deposition of Nurse Gunton was not taken in
discovery for this case, rather, plaintiff refers throughout his Statement of Material Facts to a
deposition of Ms. Gunton taken in the pending state court wrongful death action brought by the
Estate of Edwin Lloyd against Country Meadows.  (See Country Meadows Mat. Facts 2 n.1.)

life threatening.  (See id. 212:22-213:5.)

Dr. Columbo ordered basic labs, a chest x-ray and a CAT scan of Mr. Lloyd's
chest.  (Lipare Mat. Facts ¶ 29.)  He read the CAT scan to demonstrate that Mr. Lloyd had
two acute rib fractures and a pneumothorax (ordinarily due to a punctured lung).  (N.T.
7/13/05 205:4-6, 207:20-24.)  Dr. Kelly Freed was a diagnostic radiologist at Lehigh
Valley Hospital and was working on September 25, 2004.  Dr. Freed read Mr. Lloyd's
CAT scan on September 26, 2004, finding, at that time, a "small less than 5% right
pneumothorax" and fracture of right seventh and eighth ribs.  (See Affidavit of Kelly
Freed, MD., May 14, 2007, Def. Lipare Mat. Facts, Ex. D (hereinafter "Freed Aff.").)
Though Mr. Lloyd had previous x-rays indicating old rib fractures that had been healing
(See Pl.'s Mat. Facts ¶¶ 35-36), Dr. Freed testified that she would have stated in her final
report if, at the time, she thought Mr. Lloyd's injuries were old or chronic.  (See
Commonwealth v. Collins, July 14, 2005, N.T. 19:6-10, Pl.'s Mat. Facts, Ex. B
(hereinafter "N.T. 7/14/05").)

Mr. Lloyd stayed in the emergency room for approximately 3 hours, then he was
transferred to a Trauma Center at Lehigh Valley Crest View, where his condition slowly
improved.  (See Christie Mat. Facts ¶ 128.)  On September 26, 2004, an x-ray of Mr.
Lloyd's chest was read by Dr. Wen Young to indicate no pneumothorax.  (See Pl.'s Mat.
Facts ¶ 37.)  Dr. Mary Cohen performed a psychiatric consultation on October 3, 2004,
finding that Mr. Lloyd thought the year was 2005 and that he was in a diner.  (See

Consultation Rep. of Dr. Zemack, Pl.'s Mat. Facts, Ex. P.)  On October 7, 2004, Dr.

Kenneth Zemack examined Mr. Lloyd and found that he had a personality disorder and no

chest pain; Mr. Lloyd did not recall any trauma at this time.  (See id. ¶ 38.)  Mr. Lloyd

returned to the Country Meadows Nursing Center on October 11, 2004.

D.      Criminal Investigation of Mr. Lloyd's Complaint by Defendant Lipare

When Mr. Lloyd was transferred to the Emergency Room from Country Meadows,

the Bethlehem Township Police Department was notified of the 911 call by the

Northampton County Emergency Response Center, and responded to the call.  Country

Meadows did not call the police.  (See Lipare Dep. 48:24-50:5.)  Bethlehem Township

Police Officer Troy Abelovsky arrived at Country Meadows at 9:40 a.m.  Lloyd told

Abelovsky that he had been struck in the chest, and Abelovsky observed a red mark in the

center of Lloyd's chest and believed that "it would possibly [have] been related to a

punch injury."  (See N.T. 7/13/05 152:18-154:6, Def. Country Meadows' Mat. Facts., Ex.

F.)[7]  Abelovsky contacted Barbara Lissenden, Assistant Director of Nursing at Country

Meadows, to obtain the name of the man who Lloyd described as "John."  Lissenden

advised him that John Collins was employed by Country Meadows and had worked the

preceding night assigned to Mr. Lloyd's care.  Abelovsky then contacted Defendant Scott

---

[7]Mr. Collins notes that Nurses Rogers and Gunton described the mark on Mr. Lloyd's
chest as petechiae rash.  (See Pl.'s Mat. Facts ¶ 17.)  In fact, Nurse Rogers read another nurse's
notes during her deposition, rather than testifying about her own observations.  (See Rogers Dep.
84:15-24.)  The record also does not reflect that either nurse informed Abelovsky about this
diagnosis.

8

Lipare, a detective with the Bethlehem Township Police Department who was in charge of all investigations, and apprised him of Lloyd's complaint of a punch to the chest and the information that he had received and observed concerning Mr. Lloyd's condition.

Defendant Lipare then began conducting an investigation into the alleged abuse of Mr. Lloyd, which included interviewing Barbara Lissenden, Mr. Lloyd, Betty Jean Gunton, R.N., Madeline Velez, Mark Gutekust, R.N., and Dr. Adam Columbo. (See Pl.'s Mat. Facts ¶ 4.) As a result of his initial investigation, Mr. Lipare prepared an Affidavit of Probable Cause that led to the arrest of the plaintiff, Mr. Collins. (See Affidavit of Probable Cause, Pl.'s Mat. Facts, Ex. A (hereinafter "P.C. Aff.").)

Detective Lipare began his investigation at the Lehigh Valley Hospital around 12:30 p.m. on September 25, 2004. There, Lipare learned from Mark Gutekust, the charge nurse at Lehigh Valley Hospital that morning, that Mr. Lloyd sustained four fractured ribs and a bruise on his chest consistent with a fist impression, and that he was currently undergoing a CAT scan to check for additional injuries. (N.T. 7/13/05 167:16-168:9; 1/3/08 Lipare Dep. 11:21-12:17.) Lipare then interviewed Lloyd when he returned from his CAT scan. Lloyd told Lipare that someone named "John" had punched him in the chest. He told Lipare that "John" had previously stated that "I'll punch you and I will go to jail and you will go to the hospital." (1/3/08 Lipare Dep. 12:23-16:14; N.T. 7/13/05 169:13-16, 173:13-24.) Mr. Lloyd also stated that "after being assaulted John keep [sic] coming in and out of his room and at one point was pressing on his right arm saying he

9

had to stop the bleeding." (<u>See</u> P.C. Aff. ¶ 4.)  Lipare photographed Mr. Lloyd's chest

injuries, and believed the markings to be consistent with a punch to the chest. (<u>See</u> N.T.

7/13/05 170:16-173:12.)

Lipare then spoke to Dr. Columbo, who also advised him that Lloyd had sustained

four fractured ribs, and a bruise consistent with a fist. (Lipare Dep. 17:23-19:4.)  Dr.

Columbo assessed Lloyd's mental state as oriented and not exhibiting symptoms of

Alzheimer's.  Lipare did not recall asking Dr. Columbo if ribs 4 to 7 could be broken by a

punch to Mr. Lloyd's chest. (<u>See</u> Lipare Dep. 19:24-20:5, 30:7-25.)  At 11:00 a.m. on

September 25, 2004, Dr. Columbo had reviewed the chest x-ray of Mr. Lloyd, which

demonstrated old rib fractures.  His review did not change his opinion that Mr. Lloyd had

new rib fractures and a pneumothorax. (N.T. 7/13/05 216.)  Plaintiff notes that as a

resident, Dr. Columbo's readings needed to be certified by an attending physician. (<u>See</u>

Pl.'s Mat. Facts ¶ 34.)  Detective Lipare's Affidavit of Probable Cause describes Dr.

Columbo as the attending physician. (<u>See</u> P.C. Aff.)

After interviewing Dr. Columbo, Detective Lipare went to Country Meadows.  He

interviewed Nurse Gunton, who told him that Mr. Lloyd had said that "John" hit him in

the chest. (1/3/08 Lipare Dep. 20:6-21:2.)  She also told him about Mr. Lloyd's collapse

when nursing assistants Madeline Velez and Justine Reuben were helping him out of his

chair to perform a body check. (<u>Id.</u> 21:9-22:9.)  Lipare interviewed Madeline Velez, who

had observed the red bruise on Mr. Lloyd's chest.  Velez also told Detective Lipare that

10

Lloyd said he was hit by "John" (Id. 23:16-24:13.), and that she and Justine Reuben witnessed Mr. Lloyd's collapse when they tried to get him up from his recliner.  (Id.) Lipare testified that he was told by Velez that there was "bad blood between [Mr. Lloyd and plaintiff], they didn't get along."  (Id. 36:2-38:10.)

Next Lipare interviewed Barbara Lissenden, who had arrived at Country Meadows at the same time as the ambulance.  Mr. Lloyd told her that he was hit the night before by "John," and she saw the marks on his chest.  (Id. 25:13-24.)  Lissenden told Lipare that she had contacted the plaintiff, Mr. Colllins, to inquire about what happened, and he had denied striking Lloyd.  (Id. 26:20-27:1.)  She said plaintiff told her that Mr. Lloyd went to swing at him, but plaintiff did not recall any physical contact.  (Id.)

Lipare began preparing an Affidavit of Probable cause to file criminal charges against John Collins.  At 4:25 p.m., Lipare called Dr. Columbo at the Lehigh Valley Hospital.  Dr. Columbo informed Lipare that the CAT scan results showed fractured ribs, a pneumothorax consistent with a punctured right lung, and a bruised left lung.  (Id. 31:6-32:3.)  Dr. Columbo also informed Lipare that Mr. Lloyd was being admitted to the trauma unit.  (Id.)  At 5:00 p.m., Lipare contacted plaintiff, Mr. Collins, and asked him to come to police headquarters.  When he arrived, Mr. Collins was arrested and arraigned before a magistrate judge that evening.  (Id. 32:9-33:15.)

Lipare's Affidavit of Probable Cause does not mention that Mr. Lloyd was 92 years old, with Alzheimer's and Dementia, who was partially blind.  (See Lipare Dep.

11

27:11-22, 22:19-25, 16:18-25; P.C. Aff.)  The record reflects that Lloyd himself informed

Lipare that he was partially blind.  (See Lipare Dep. 16:18-20.)  Lipare was aware that

one of the nurses believed Mr. Lloyd had a petechiae rash, though in his deposition he did

not recall if he learned this before Mr. Collins' arrest.  (See id. 40:9-18.)  Lipare also

omits that Mr. Lloyd collapsed or was assisted to his knees on the date of the incident.

(See Lipare Dep. 21:22-22:7.)  Lipare testified that he did not learn whether Ms. Velez's

statements concerning "bad blood" between plaintiff and Mr. Lloyd were substantiated.

(See id. 70:6-71:4.)  Though paragraph two of the Affidavit of Probable Cause reports of

other incidents where plaintiff and Mr. Lloyd would "yell and scream foul language at

each other," (See P.C. Aff.), Lipare did not identify witnesses other than Mr. Lloyd who

overheard a yelling match between plaintiff and Mr. Lloyd in the Affidavit of Probable

Cause.  He did not find corroborating witnesses to any prior threats by plaintiff to Mr.

Lloyd.  (N.T. 7/13/05 183:2-7; 184:6-22.)  The Affidavit of Probable Cause also did not

report that Mr. Lloyd had a history of using racially derogatory remarks.

　　　　As a result of the events of September 24, 2004, Country Meadows suspended

plaintiff with pay while the investigation was conducted.  It terminated plaintiff's

employment effective October 11, 2004.  (See Compl. ¶ 36.)

E.　　Criminal Complaint and Continuing Investigation

　　　　On September 25, 2004, Mr. Collins was arrested by Detective Lipare.  Mr.

Collins did not speak to Detective Lipare concerning the incident at Country Meadows,

after being advised of his rights.  Mr. Collins was arraigned by Magistrate Banner on

charges of felony and misdemeanor aggravated assault, 18 Pa. C.S. § 2701-02(a)(1), for

"punch[ing] Mr. Lloyd in the chest breaking 4 ribs on his right side, a bruised left lung

and a Pneumothorax to the right lung."  (Police Criminal Compl., Lipare Mat. Facts, Ex.

G; Compl., Ex. A ¶ 63.)  Lipare prepared the Criminal Complaint and the Affidavit of

Probable Cause, and did not seek the opinion of anyone at Country Meadows as to

whether they thought plaintiff had assaulted Lloyd.  (See Lipare Dep. 28:4-16, 44:1-45:1,

68:23-69:21.)

Lipare continued his investigation after Mr. Collins' arrest.  He interviewed Justine

Reuben and Linda Meyer, a licensed practical nurse, on September 26, 2004.  (Id. 48:10-

16.)  Reuben described her observations to Lipare, including his allegation that "John"

had punched him and the fact that Mr. Lloyd had vomited a dark substance when she and

Velez assisted him up from his recliner.  (See id. 48:24-49:8.)  Linda Meyer advised

Lipare that Lloyd had also told her that "John" hit him, that she observed a large rash area

on his chest on the morning of September 25, 2004, and that she told Nurse Gunton to

call 911.  (See id. 49:20-50:5.)

On September 28-29, 2004, Lipare interviewed Linda Harmon, Diana Sawruk,

R.N., Adam Williams, CNA, Tanya Rogers, R.N., and Cynthia Ibarra, CNA.  All four

employees told Lipare that Mr. Lloyd had complained to them that "John" punched him in

the chest.

13

F.      Criminal Trial: Commonwealth v. Collins

On October 12, 2004, Edwin Lloyd testified at the preliminary hearing in the criminal prosecution of Mr. Collins.  (See Prelim. Hr'g Tr., Christie Mat. Facts, Ex. N, Oct. 12, 2004, 4:22.)  Mr. Lloyd testified that Mr. Collins had punched him in the chest with his fist, and that he did not fall from his recliner chair.  (Id. 28:7-9.)  After his preliminary hearing, plaintiff was bound over for trial.

A trial was held in Mr. Collins' criminal case in Northampton County Court of Common Pleas on July 12, 2005 through July 14, 2005.  Mr. Lloyd's testimony from the preliminary hearing was presented to the jury by videotape.  (See Commonwealth v. Collins, July 12, 2005, Christie Mat. Facts, Ex. O, 3:19-4:5 (hereinafter "N.T. 7/12/05").)

During the criminal trial of Mr. Collins, the Northampton County District Attorney's office called the following witnesses: Edwin Lloyd (videotaped hearing testimony), Justine Reuben, Madeline Velez, Linda Meyer, Barbara Lissenden, Linda Harmon, Diana Sawruk, Adam Williams, Jr., Troy Abelovsky, Scott Lipare, Adam Columbo, D.O., and Kelly Freed, M.D.

Dr. Freed was expected to testify that there were fractures and a pneumothorax depicted on the September 25, 2004 CAT scan of Mr. Lloyd's chest.  (See Freed Aff. ¶¶ 2-6.)  However, on July 13, 2005, the eve of her testimony, Dr. Freed informed the District Attorney's office that the fractures identified in her original report on Mr. Lloyd's CAT scan were, in fact, old fractures visible on a prior x-ray.  (Id. ¶¶ 12-14; N.T. 7/14/05

14

3:9-5:25; 11:10-18:9.)  She also informed the prosecutor that she would not be able to testify "within a reasonable degree of medical certainty" that Lloyd had suffered a pneumothorax.  (Id.)

On July 14, 2005, after Dr. Freed revised her opinion as to the cause of Mr. Lloyd's injuries, the District Attorney dismissed the charges against Mr. Collins based on insufficient evidence. (See N.T. 7/14/05 6:20-7:6; 24:13-29:8.)  The District Attorney informed the Court that the charges of aggravated and simple assault had been based on the medical information, and that with Dr. Freed's recant, the charges would be dropped. (Id.)[8]

G.    Defendant Christie's Medical Experts[9]

Defendant Christie submits the opinions of Dr. A. Robert Tantleff, board certified in radiology, and Dr. Terrance L. Baker, board certified in geriatric medicine.  Dr. Tantleff reviewed Mr. Lloyd's CAT scans from September 25, 2004 and September 29,

---

[8]Defendant Christie has moved to exclude Dr. Freed as an expert and to strike plaintiff's Expert Report, which consists of Dr. Freed's testimony at plaintiff's criminal trial (Document #84).  For the purposes the present motion for summary judgment, I need not resolve Christie's motion to exclude Mr. Collins' proposed expert, as Mr. Collins has not put forward Dr. Freed's trial testimony as expert opinion in conjunction with his opposition to summary judgment.

[9]Mr. Collins raises no objection to the qualification of defendant Christie's proposed experts.  I have reviewed the curricula vitae and affidavits included in defendant Christie's Statement of Material Facts, indicating the qualifications and likely testimony of Christie's experts at trial (Document #80-20, 80-21).  At this time, I am prepared to make a preliminary ruling, pursuant to Federal Rules of Evidence 702, 703 and 104(a), that Drs. Baker and Tantleff are qualified to render expert opinions in accordance with their affidavits, and I will consider the affidavits as such to the extent they are relevant to resolving Christie's motion for summary judgment.  This preliminary ruling is limited to the resolution of the present motion for summary judgment, and is subject to reconsideration at future stages of litigation, if necessary.

2004, finding significant soft tissue injury to the left chest around the sternum, mid-body. He concluded that these results are indicative of injury caused by blunt force trauma to the chest. His findings are independent of any conclusion that Mr. Lloyd suffered rib fractures or pneumothorax, as discussed above. (See Decl. of A. Robert Tantleff, M.D., Feb. 20, 2008, Def. Christie Mat. Facts, Ex. S; Christie Mat. Facts ¶¶ 82-94.)

Dr. Baker reviewed clinical records, facility investigation reports and healthcare provider statements relating to Mr. Lloyd. He concluded that these records contained objective medical evidence that Mr. Lloyd suffered blunt force trauma to his chest on September 24, 2004, and that this trauma would be consistent with a punch with a closed fist by a well-developed adult. Like Dr. Tantleff, Dr. Baker did not base his opinion on the presence or absence of rib fractures or a pneumothorax. (See Decl. of Terrance L. Baker, M.D., Feb. 26, 2008, Def. Christie Mat. Facts, Ex. T; Christie Mat. Facts ¶¶ 95-124.)

## II. PROCEDURAL HISTORY

Now pending are defendants' three motions for summary judgment. On August 22, 2007, this Court addressed defendant Marilyn Christie's motions to dismiss, granting the motion as to some of plaintiff's claims. (See Document #59.)[10] The following claims

---

[10]In my Order of August 22, 2007, I also granted Defendants Dr. Adam Columbo and Lehigh Valley Hospital's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) in its entirety. Defendant Dr. Kelly Freed filed motions to dismiss and a motion to strike. See Document Nos. 19, 41, and 48. On May 22, 2007, the plaintiff filed Notice of Dismissal of Defendant Kelly Freed, M.D., Pursuant to Federal Rule of Civil Procedure 41(a)(1) (Document #58).

remain to be addressed on summary judgment:

(1)    Against defendant Christie:
        Count I: 42 U.S.C. § 1981 allegation that Mr. Lloyd's intentional
        racial discrimination denied plaintiff's right to make contracts and to
        the full and equal benefit of the laws (Compl. ¶¶ 16-26); and
        Count IX: malicious prosecution (Compl. ¶¶ 124-28)

(2)    Against defendant Country Meadows:
        Count II: 42 U.S.C. § 1985 based on alleged conspiracy between
        Country Meadows and Lloyd to make false accusation (Compl. ¶¶
        27-41);
        Count V: 42 U.S.C. § 1983 and 42 U.S.C. § 1985 conspiracy
        between Lipare and Country Meadows to arrest plaintiff (Compl. ¶¶
        77-85);
        Count VII: 42 U.S.C. § 1981 for negligence in failing to prevent
        racial conspiracy (Compl. ¶¶ 102-111); and
        Count XI: malicious prosecution (Compl. ¶¶ 134-38)

(3)    Against defendant Lipare:
        Count III: violation of 42 U.S.C. § 1983 for false statements or
        omissions on the Affidavit of Probable Cause (Compl. ¶¶ 42-70);
        Count IV: violation of 42 U.S.C. § 1981 for rushing to judgment
        based on plaintiff's race (Compl. ¶¶ 71-76);
        Count V: 42 U.S.C. § 1983 and 42 U.S.C. § 1985 conspiracy
        between Lipare and Country Meadows to arrest plaintiff (Compl. ¶¶
        77-85); and,
        Count X: malicious prosecution (Compl. ¶¶ 129-133.)

In his Memorandum of Law in Opposition to Defendant Country Meadows'

Motion for Summary Judgment (Document #87), plaintiff concedes that summary

judgment is appropriate as to Counts II and VII under the doctrine of law of the case as

against defendant Country Meadows, citing this Court's August 22, 2007 Order

dismissing similar causes of action as against defendant Christie.  "The law of the case

doctrine is a principle of disciplined self-consistency by which courts are reluctant to

reopen a ruling once made, but this constraint is a matter of discretion." Davis v.

Pennsylvania, No. 06-4953, 2007 U.S. Dist. LEXIS 17459, at *8 (E.D. Pa. Mar. 12, 2007)

citing CHARLES WRIGHT, ARTHUR MILLER & EDWARD COOPER, 18B FEDERAL PRACTICE

AND PROCEDURE § 4478 (2d ed. 2002).  The doctrine's purpose is to avoid inconsistencies

caused by reconsideration of the same issues at different stages of a single lawsuit.

Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 69 (3d Cir. 1999).  In light

of plaintiff's voluntary concession that summary judgment is appropriate as to Counts II

and VII, I will grant defendant Country Meadows' motion with respect to these claims.

Plaintiff also concedes that Count V (conspiracy between Country Meadows and Lipare)

is appropriate for summary judgment because plaintiff cannot adduce adequate facts to

show significant contact between Country Meadows and Lipare to establish the alleged

conspiracy.  Accordingly, I will grant Country Meadows' motion with respect to Count V.

 In his Memorandum of Law in Opposition to Defendant Lipare's Motion for

Summary Judgment (Document #89), plaintiff concedes that summary judgment is

appropriate for Count IV (due to insufficient evidence to establish that Lipare's actions

were motivated by plaintiff's race) and Count V (due to insufficient evidence to establish

a conspiracy between Lipare and Country Meadows).  I will therefore grant Lipare's

motion as to Counts IV and V.

 Remaining to be addressed are: (1) plaintiff's 42 U.S.C. § 1981 allegation against

defendant Christie (Count I); (2) plaintiff's 42 U.S.C. § 1983 allegation against defendant

Lipare; and (Count III) (3) plaintiff's state law malicious prosecution claims against all three defendants (Counts IX, X and XI).

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by

making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.   DISCUSSION

### A.      § 1981 Claim against Defendant Christie

Defendant Christie has moved for summary judgment against plaintiff on his § 1981 claim against Mr. Lloyd in Count I. Mr. Collins alleges that Mr. Lloyd intentionally made a false accusation of assault in order to place Mr. Collins' employment in jeopardy. I previously denied defendant Christie's motion to dismiss Count I, preferring to "allow discovery to go forward to determine Mr. Lloyd's actual role in the plaintiff's termination." See Collins v. Christie, No. 06-4702, 2007 U.S. Dist. LEXIS 61579, at *30

(E.D. Pa. Aug. 22, 2007).

Section 1981, which prohibits racial discrimination in the making and enforcement of contracts and property transactions, provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).

A plaintiff alleging a claim pursuant to § 1981 must plead sufficient facts in support of the following elements: "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts." Brown v. Philip Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001). The Untied States Supreme Court has emphasized that a claim under § 1981 requires proof of purposeful or intentional discrimination. See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982) ("We conclude, therefore, that § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination.")

A third party can be liable under § 1981 if that party intentionally interferes, on the basis of race, with another's right to make and enforce contracts, regardless of whether the employer or anyone else may also be liable. See McClease v. R.R. Donnelley & Sons

21

Co., 226 F. Supp. 2d 695, 699 (E.D. Pa. 2002); Cimino v. Del. Dep't of Labor, No. 01-458, 2002 U.S. Dist. LEXIS 2979, at *15-17 (D. Del. Feb. 25, 2002) (quotation and citation omitted); Pryor v. Nat'l Collegiate Athletic Ass'n, 153 F. Supp. 2d 710, 718 (E.D. Pa. 2001), rev'd in part on other grounds, 288 F.3d 548 (3d Cir. 2002).  Making and enforcing contracts is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  "Every appellate court that has examined the legislative history of the 1991 statute has concluded that Congress intended the term 'contract' to encompass at-will employment."  McClease, 226 F. Supp. 2d at 701 (citing authorities).

The parties do not dispute that plaintiff, an African American male, satisfies the first element of the cause of action.  As to the second element, Mr. Collins has adduced evidence to show that Mr. Lloyd generally harbored racial animosity, in the form of Nurse Gunton's observation that Mr. Lloyd often used the derogatory term "nigger."  (See Gunton Dep. 96:20-97:6; 98:8-99:6.)  See Moore v. City of Phila., 461 F.3d 331, 344-45 (3d Cir. 2006) (describing such language as a "racially charged epithet[]"); Boyer v. Johnson Matthey, Inc., No. Civ.A. 02-CV-8382, 2005 U.S. Dist. LEXIS 171, 2005 WL 35893, at *15 (E.D. Pa. Jan. 6, 2005); but see Schultz v. Wilson, 2007 U.S. Dist. LEXIS 88994 (M.D. Pa. Dec. 4, 2007) (holding that a single racial epithet, though derogatory, "highly offensive and demeaning," was an "isolated derogation uttered to companions,"

22

insufficient under the circumstances to raise an inference of racial malice) (citing

McGinest v. GTE Svc. Corp., 360 F.3d 1103, 1116 (9th Cir. 2004)).  Mr. Collins also

presents the testimony of Justine Reuben at Mr. Collins' criminal trial, where she stated

that Mr. Lloyd referred to Mr. Collins as a "big black bully" on the day after the incident.

(See Pl.'s Resp. to Christie Mat. Facts, Ex. M.)[11]  Finally, Mr. Collins refers to the

testimony of Nurse Rogers at his criminal trial, that Mr. Lloyd told her that Mr. Collins

"shouldn't be allowed to work here anymore" on the day of the incident.  (See Pl.'s Resp.

to Christie Mat. Facts, Ex. C.)  I find this evidence sufficient to withstand summary

judgment, and that material factual issues remain in dispute concerning the role that Mr.

Lloyd's demonstrated racial malice played in his actions relating to Mr. Collins'

termination–factual issues which must be resolved by a jury.

Defendant Christie argues that plaintiff cannot meet his burden under § 1981

because he has offered no evidence, beyond his own denial, that Mr. Lloyd made a false

accusation against him.  In order to succeed on his § 1981 claim, Mr. Collins bears the

initial burden of showing, by a preponderance of the evidence, that Mr. Lloyd acted

purposefully or intentionally to interfere with plaintiff's employment relationship, and

---

[11]Plaintiff further asserts that a nurse's note dated October 14, 2004, during Mr. Lloyd's recovery at the trauma center, states that Mr. Lloyd said "go back where you came from."  (See Pl.'s Resp. to Christie Mat. Facts, Ex. L.)  Mr. Collins has not explained how this comment, even if it were admissible under the hearsay rule, would be relevant to his claim.  See Philbin v. Trans Union Corp., 101 F.3d 957, 961 (3d Cir. 1996) ("[a] hearsay statement … is not capable of being admissible at trial, and could not be considered on a motion for summary judgment") (internal citations and quotation marks omitted); Nichols v. Bennett Detective & Protective Agency, Inc., 2006 U.S. Dist. LEXIS 35491 (D. Del. May 31, 2006).  I will therefore disregard the statement.

that Mr. Lloyd's actions were motivated by racial animus against plaintiff.  See Brown,

250 F.3d at 797.  Making this showing under the facts of the present case necessitates

proof that Mr. Lloyd's accusation was false.[12]

Mr. Collins testified at his criminal trial that he did not hit Mr. Lloyd on September

24, 2004.  (See Pl.'s Resp. to Christie's Mat. Facts, Ex. A.)  Christie argues strenuously

that Mr. Collins has failed to negate her evidence that he *did* hit Mr. Lloyd, beyond his

own "self-serving" denial.  Defendant is correct that more than unsubstantiated denials

are required at the summary judgment stage to adequately establish an essential element

in defense of plaintiff's cause of action.  See, e.g., Scott v. Harris, — U.S. —, 127 S. Ct.

1769, 1776 (2007) ("When opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment."); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87

(1986) ("When the moving party has carried its burden under Rule 56(c), its opponent

must do more than simply show that there is some metaphysical doubt as to the material

facts . . . Where the record taken as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no 'genuine issue for trial.'")  This is particularly true

because plaintiff's task is affirmatively to establish that Mr. Lloyd's accusation was false.

---

[12]I note that the decision to dismiss the charges against Mr. Collins in the criminal case in Northampton County bears limited relevance here, where Mr. Collins, as plaintiff, shoulders the affirmative burden of proving by a preponderance that he did not punch Mr. Lloyd.  Collins had no burden in the criminal case.

See <u>Celotex</u>, 477 U.S. at 322.

In the face of defendant Christie's objective evidence that Mr. Lloyd's injuries resulted from a punch to the chest, Mr. Collins submits the following evidence in addition to his sworn testimony that he did not hit Mr. Lloyd: (1) the observations of nursing staff that Mr. Lloyd may have suffered from a petechiae rash, which have causes other than a punch (See Gunton Dep. 102:6-20; Rogers Dep. 84:15-24); (2) the testimony of nurses who did not observe marks on Mr. Lloyd's chest on the evening of September 24, 2004 (See Rogers Dep. 54:6-55:25; N.T. 7/13/05 111-122 (Nurse Sawruk); (3) the testimony of Nurse Sawruk that Mr. Lloyd felt pain in the sides of his chest, rather than the sternum area (See N.T. 7/13/05 111:16-17); and, (4) the fact that it was not until the morning of September 25, 2004 that Mr. Lloyd collapsed and vomited, while under the care of nurse aides Reuben and Velez (See, e.g., Pl.'s Resp. to Christie Mat. Facts ¶¶ 28.)

Contrary to defendant Christie's assertion, this is not a case where plaintiff's evidence is "blatantly" contradicted by the record.  <u>Scott</u>, 127 S. Ct. 1769, 1776 (noting the "existence in the record of a videotape capturing the events in question").  There is no videotape of the events that took place in Mr. Lloyd's room on September 24, 2004. Summary resolution by the Court would be inappropriate in light of the evidence furnished by Mr. Collins in support of his claim.  A genuine issue remains as to whether or not Mr. Lloyd acted with discriminatory purpose to accuse Mr. Collins of abuse, as well as to the cause of Mr. Lloyd's injuries (the second and third element of Mr. Collins'

Section 1981 claim).  The weighing of factors such as credibility are not for the court to

decide on summary judgment.  See Anderson, 477 U.S. at 255 ("[c]redibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge").  I will therefore deny defendant

Christie's motion with respect to Count I.

B.     § 1983 Claim against Defendant Lipare

Defendant Lipare moves for summary judgment on Count III, plaintiff's § 1983

claim of false arrest made pursuant to an invalid warrant, on the ground that probable

cause existed to arrest Mr. Collins.  To state a claim under 42 U.S.C. § 1983, Mr. Collins

must prove: (1) that defendants deprived him of a constitutional right (2) while acting

under color of law.  West v. Atkins, 487 U.S. 42, 48 (1988).  To succeed on a challenge to

the sufficiency of Lipare's Affidavit of Probable Cause, plaintiff must show, by

preponderance of the evidence:

> (1) that the affiant knowingly and deliberately, or with a reckless disregard
> for the truth, made false statements or omissions that created the falsehood
> in applying for the warrant; and (2) that such statements or omissions are
> material, or necessary, to the finding of probable cause.

Franks v. Delaware, 438 U.S. 154, 155 (1978); Sherwood v. Mulvihill, 113 F.3d 396 (3d

Cir. 1997).  There is no dispute that defendant Lipare, as a police detective for Bethlehem

Township, acted under color of state law.  I must therefore decide whether Detective

Lipare's conduct violated Mr. Collins' Fourth Amendment rights under Franks.

Probable cause is present "[i]f at the moment the arrest was made . . . the facts and

circumstances within [the defendant's] knowledge and of which [he] had reasonably

trustworthy information were sufficient to warrant a prudent man in believing that the

plaintiff had violated the law." Hunter v. Bryant, 502 U.S. 224, 228 (1991) (quoting

Beck v. Ohio, 379 U.S. 89, 91 (1964)) (internal quotation omitted); see also Orsatti v.

New Jersey State Police, 71 F. 3d 480, 483 (3d Cir. 1995). This standard does not impose

on an officer a requirement to undertake extensive investigation and witness interviews

before arresting a suspect. See, e.g., Merkle v. Upper Dublin Sch. Dist., 211 F.3d 782 (3d

Cir. 2000) (holding that a single interview of school principal was sufficient to establish

probable cause, where the witness was found by the officer to be credible). While the

existence of probable cause is generally a question of fact reserved for the jury in a §

1983 case, Montgomery v. De Simone, 159 F.3d 120, 124 (3d Cir. 1998); Sharrar v.

Felsing, 128 F.3d 810, 818 (3d Cir. 1997); Deary v. Three Un-Named Police Officers,

746 F.2d 185, 190-92 (3d Cir. 1984), "a district court may conclude that probable cause

exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably

would not support a contrary factual finding, and may enter summary judgment

accordingly." Merkle, 211 F.3d at 789 (quoting Sherwood v. Mulvihill, 113 F.3d 396,

401 (3d Cir. 1997)) (internal quotation omitted).

Plaintiff claims that Detective Lipare's Affidavit of Probable Cause contained

errors and omissions that he either "knew [were] false, or would have known [were] false

except for his reckless disregard for the truth." Wilson v. Russo, 212 F.3d 781, 787 (3d

Cir. 2000).  Omissions are made with reckless disregard if an officer withholds a known fact that "any reasonable person would have known . . . the judge would wish to know." Id.  Police officers need not "relate the entire history of events leading up to a warrant application with every potentially evocative detail."  Id.  Assertions are made with reckless disregard when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  Id. (internal citations omitted).

Plaintiff's claim fails on both prongs of the Franks analysis.  First, drawing reasonable inferences in his favor, the plaintiff fails to furnish sufficient evidence of reckless or knowing submission of false information by Lipare to support of his § 1983 claim.  See Franks v. Delaware, 438 U.S. 154, 155 (1978).  Second, the omissions cited by plaintiff would not be material to a finding of probable cause.  See id.  Even if Lipare had included all of the information identified by plaintiff in his brief, under the totality of the circumstances, the facts would still be sufficient to establish probable cause to arrest Mr. Collins.  See United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984), cert. denied, 471 U.S. 1018 (1985) (stressing the requisite "totality of the circumstances" approach, informed by the "common sense aspect to the issue of probable cause") (quoting Illinois v. Gates, 462 U.S. 213 (1983)).


        1.      Reckless Disregard for the Truth

Mr. Collins alleges the following omissions and inaccurate assertions made by Lipare in his Affidavit of Probable Cause: (1) that Lloyd was 92 year old Alzheimer's and Dementia patient living in a nursing home (Mr. Lloyd is described only as an elderly male); (2) that Lloyd was partially blind; (3) that no reports of "yelling and screaming" matches between plaintiff and Lloyd were ever recorded at the facility; (4) the differential diagnosis by Gunton that Mr. Lloyd's injury looked like a petechial rash; (5) that, despite Mr. Lloyd's report that plaintiff was "pressing on his right arm . . . to stop the bleeding," Lloyd had no injuries to his arm; (6) that Dr. Colombo is described as an attending physician, when he was only a resident physician; and (7) that Mr. Lloyd fell on the morning of September 25, 2004.  Apart from the error with regard to Dr. Colombo's position,[13] plaintiff has alleged only that Mr. Lipare omitted certain information that may have exculpated him or weighed against a finding of probable cause.

To raise an inference of reckless disregard, plaintiff must show (1) that defendant had knowledge of the omitted information, and (2) that any reasonable person would have known that the magistrate would want to know about the omitted information.  <u>See</u>

_____

[13]Mr. Collins furnishes no reliable evidence to support his argument that Dr. Colombo was inexperienced and uncertified to render a medical opinion.  Simply because Dr. Colombo was a resident physician, Mr. Collins asks the Court to assume his opinion should have been disregarded by Lipare because it was not "certified by an attending physician."  This inference is not warranted on the present record.  Plaintiff does not point to facts indicating the policies for attending physician supervision of resident physicians at the Lehigh Valley Hospital Emergency Room, that those policies would prevent Dr. Colombo from discussing his medical opinion with Mr. Lipare, or that Mr. Lipare knew the difference between an attending and resident physician at the time he drafted the affidavit.  I will therefore disregard this portion of plaintiff's argument.

29

Wilson, 212 F.3d at 787.  Witnesses interviewed by Lipare before he prepared the

challenged Affidavit of Probable Cause included the alleged victim, Mr. Lloyd, found by

Detective Lipare to be of sound mind (see Lipare Dep. 15:13-15), Acting

Director of Nursing Barbara Lissenden, Betty Jean Gunton, R.N., Madeline Velez, CNA,

Mark Gutekust, R.N., and Dr. Adam Columbo.  (See Pl.'s Mat. Facts ¶ 4.) (See P.C.

Aff.)  At the time he drafted the affidavit, Lipare had gathered physical evidence from

nursing staff at the facility and Dr. Colombo indicating that Mr. Lloyd had suffered

injuries consistent with a punch to the chest, and testimony from nursing staff at Country

Meadows corroborating Mr. Lloyd's allegations.

Despite the plaintiff's assertion, the record is unclear concerning when Lipare

learned of Nurse Gunton's description of Lloyd's injuries as petechia rash (See Lipare

Dep. 40:18-21.)  He had seen and photographed Mr. Lloyd's chest injuries, and believed

them to be consistent with a punch to the chest.  Also contrary to plaintiff's description,

Lipare testified that he did notice an injury to Mr. Lloyd's arm when they spoke at the

Emergency Room.  (See Lipare Dep. 14:7-18.)  Lipare's Investigation Report indicates

that Madeline Velez told him that Mr. Lloyd was "lowered to his knees" after he began

vomiting black liquid, not that he fell.  (See Investigation Report 11.)  Nowhere in Mr.

Lipare's Investigation Report does he indicate that he knew, on September 25, 2004, that

Mr. Lloyd suffered from Alzheimer's and Dementia, though he does note that Mr. Lloyd

is "partially blind and can't see very well."  (Id. at 10.)  Lipare's affidavit does refer to

Mr. Lloyd as an elderly male, who resided at Country Meadows.  Mr. Lloyd's accusation is corroborated in the affidavit by the physical evidence known to Lipare at the time, as well as the fact that Mr. Collins was working at the time of the incident.

On this record, I do not find that Mr. Collins has raised a genuine issue as to whether Mr. Lipare's purported omissions raise an inference of reckless disregard.  They do not.  Many of the omitted facts cited by plaintiff are either distorted, or were not known to Mr. Lipare at the relevant time, even drawing inferences in favor of plaintiff.

2.    Materiality

Even if an inference of reckless disregard could be drawn from the facts, the omissions cited by plaintiff were immaterial to a finding of probable cause.  See Franks, 438 U.S. at 155; Wilson, 212 F.3d at 789.  As a matter of law, more than a "fair probability" existed at the time of arrest that Mr. Collins had committed the crimes of aggravated and simple assault under Pennsylvania law.[14]  Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994).

The materiality prong of Franks involves "the reconstructive surgery" of inserting alleged omissions into Lipare's affidavit, to determine if these facts would have altered the probable cause determination.  Wilson, 212 F.3d at 789.  The "reconstructed" version

---

[14]Aggravated assault is committed when a person "attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life."  18 Pa.C.S.A. 2702(a)(1).  Simple assault is committed when a person "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another."  18 Pa.C.S.A. 2702(a)(1).

of Lipare's affidavit would still include the following facts: (1) the victim himself identified Mr. Collins to Lipare and to several of the other witnesses interviewed; (2) Lipare found Mr. Lloyd's mental state to be "fine" (Lipare Dep. 14:24), as did Dr. Colombo, Justine Reuben and Madeline Velez (see Investigation Report); (3) Mr. Collins was the only male and the only "John" working the night of September 24, 2004, and was assigned to Mr. Lloyd's room; and (4) even assuming Lipare knew of the alternate theory that Mr. Lloyd had a petechia rash, photographic and medical evidence collected by Lipare substantially corroborated the victim's allegation that he was punched in the chest.

In sum, viewed most favorably to plaintiff, the evidence of record "reasonably would not support a contrary factual finding" other than a finding of probable cause to arrest plaintiff. Merkle, 211 F.3d at 789. I will therefore grant summary judgment in favor of defendant Lipare as to Count III.

## C.      State Law Malicious Prosecution Claims

In order to succeed on a malicious prosecution claim under Pennsylvania law, the plaintiff must establish that the defendant: (1) instituted proceedings against the plaintiff, (2) without probable cause, (3) with malice, and (4) that the proceedings were terminated in favor of the plaintiff. Corrigan v. Cent. Tax Bureau of Pa., Inc., 828 A.2d 502, 505 (Pa. Commw. Ct. 2003); Hilferty v. Shipman, 91 F.3d 573, 579 (3d Cir. 1996). Under the first element, Mr. Collins must prove that "defendant[s] either directly instituted the proceedings against the plaintiff or can be charged with the responsibility for the

32

institution of the proceedings." Griffiths v. CIGNA Corp., 988 F.2d 457, 464 (3d Cir. 1993). Pennsylvania courts rely on section 653, comment g, of the Restatement (Second) of Torts in determining a defendant's responsibility for the initiation of a criminal proceeding. See id.; Cooper, 2006 U.S. Dist. LEXIS 23388, at *16-19; Bradley v. Gen. Accident Ins., 778 A.2d 707, 710-11 (Pa. Super. Ct. 2001).

> Comment g states:
>
> In order to charge a private person with responsibility for the initiation of proceedings by a public official, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

RESTATEMENT (SECOND) OF TORTS § 653, cmt. g.

### 1.    Defendant Lipare

I have already determined that Detective Lipare had adequate probable cause to arrest plaintiff on September 25, 2004, and therefore, Mr. Collins' malicious prosecution claim against Detective Lipare must fail as a matter of law. See Hilferty, 91 F.3d at 579. I will grant summary judgment in favor of defendant Lipare on this ground.[15]

### 2.    Defendant Christie

As discussed above, because a genuine issue of material fact persists regarding the cause of Mr. Lloyd's injuries, I am unable to conclude, for summary judgment purposes,

---

[15]Having dismissed all claims against defendant Lipare, I do not reach the issue of qualified immunity raised in his motion.

that Mr. Lloyd's accusation was true.  This is for a jury to determine based on credibility

assessments that I am not permitted to render.  The malicious prosecution analysis with

respect to probable cause (element (2), above) is therefore different with respect to Mr.

Collins' allegation against Mr. Lloyd as compared to Mr. Collins' allegation against

Detective Lipare.  If Mr. Collins can establish that Mr. Lloyd's accusation was false (a

matter that cannot be resolved by the Court), then subjective facts within Mr. Lloyd's own

ken would defeat probable cause for the arrest and prosecution of Mr. Collins.  Therefore,

Mr. Collins has raised a genuine issue as to the second element of his malicious

prosecution claim against Mr. Lloyd.

    As to the remaining elements, the parties do not dispute that the criminal

proceedings were terminated in favor of plaintiff.[16]  Christie also does not appear to

dispute that Detective Lipare acted upon the information supplied by Mr. Lloyd, such that

Lloyd may be held liable for malicious prosecution as a private citizen.  See Bradley, 778

---

[16]Under Pennsylvania law, a decision to withdraw charges is not always a "favorable
termination" for malicious prosecution purposes.  See, e.g., Hilfirty, 91 F.3d at 580; Mateiuc v.
Hutchinson, 1998 U.S. Dist. LEXIS 42, at *8 (E.D. Pa. Jan. 7, 1998); Davis v. Chubb/Pacific
Indem. Group, 493 F. Supp. 89, 92 (E.D. Pa. 1980). "[A] prosecutor's decision to withdraw
criminal charges pursuant to a compromise with the accused is not a termination sufficiently
favorable to support a malicious prosecution claim.  The reason for this rule is that dismissal of
charges as a result of a compromise is not an indication that the accused is actually innocent of
the crimes charged. Hilfirty, 91 F.3d at 580.  However, "[i]f the defendant is discharged after
abandonment of the charges by the prosecutor, or the charges are withdrawn by the prosecutor,
this is sufficient to satisfy the requisite element of prior favorable termination of the criminal
action." Haefner v. Burkey, 534 Pa. 62, 66 (Pa. 1993) (citing Woodyatt v. Bank of Old York
Road, 408 Pa. 257, 259, 182 A.2d 500, 501 (1962); see also Taylor v. Winters, 115 Fed. Appx.
549, 552 (3d Cir. Pa. 2004).

A.2d at 710-11.  Sufficient evidence exists in the record to suggest that Mr. Lloyd's

"direction, request or pressure of any kind, was the determining factor" for Mr. Lipare's

continued investigation and filing of charges.  RESTATEMENT (SECOND) OF TORTS § 653,

cmt. g; see also Griffiths v. CIGNA Corp., 988 F.2d 457, 464 (3d Cir. 1993) (explaining

the difference "between situations in which a private individual files a complaint or

demands a prosecution and those in which he merely provides information to the police.")

Because I cannot conclude, as a matter of law, that Mr. Lloyd's accusation was true, a

genuine issue also remains as to whether or not Mr. Lloyd supplied knowingly false

information upon which Detective Lipare acted in charging plaintiff with assault.

Under the third element listed above, malice may be inferred from lack of probable

cause, and therefore a genuine issue remains as to whether plaintiff can satisfy the malice

requirement.  See Hugee v. Pennsylvania Railroad Co., 376 Pa. 286, 291, 101 A.2d 740,

743 (1954).  Mr. Collins has also adduced evidence demonstrating that Mr. Lloyd

harbored racial animosity, against plaintiff and toward African-Americans generally,

which further supports a finding of malice.  See Webb v. Roadway Express Inc., 2000 Pa.

Dist. & Cnty. Dec. LEXIS 186 (Pa. C.P. 2000) ("Our conclusion is further supported by

[plaintiff's] assertions that [defendant's] conduct was motivated by a severe racial

prejudice towards all African-Americans, including plaintiff.")

Because plaintiff has raised a genuine issue as to each element of his malicious

prosecution claim, I will deny summary judgment with respect to Count IX.

35

    3.      Defendant Country Meadows

While sufficient evidence exists in the record to suggest that Mr. Lloyd may be "charged with responsibility for institution" of the criminal proceedings against plaintiff, the opposite is true of defendant Country Meadows.  See Bradley, 778 A.2d at 710.  "[A] private individual who does not knowingly provide false information is not responsible for the institution of the proceedings, and thus cannot be held liable for malicious prosecution as he need not have had a reasonable basis for making the accusation." Griffiths v. CIGNA Corp., 988 F.2d at 464; see also Campbell v. Yellow Cab Co., 137 F.2d 918, 921 (3d Cir. 1943) (holding that a person who merely identifies the suspect and "does not otherwise attempt to influence the officers in the exercise of their discretion as to the prosecution of the person identified [if] the person making the identification believes it to be correct . . . is not deemed the instigator of criminal proceedings subsequently begun by the police . . ."); Bristow v. Clevenger, 80 F. Supp. 2d 421, 432-433 (M.D. Pa. 2000).

In this case, there is simply no meaningful evidence that any Country Meadows employee supplied knowingly false information to Detectives Abelovsky and Lipare. Country Meadows' 911 call does not amount initiation of a criminal investigation, and defendant took no other affirmative steps to contact police about Mr. Lloyd's injuries. Lipare prepared the Criminal Complaint and the Affidavit of Probable Cause, and did not seek the opinion of anyone at Country Meadows as to whether they thought plaintiff had

assaulted Lloyd.  (See Lipare Dep. 28:4-16, 44:1-45:1, 68:23-69:21.)

Plaintiff argues that the Country Meadows staff members deliberately withheld information from Detective Lipare concerning Mr. Lloyd's mental state in light of his medical condition.[17]  The record shows that Lipare obtained a copy of the medical records from Lehigh Valley Hospital as part of his investigation.  Included in these records was Nurse Gunton's completed Patient Transfer Form on which Nurse Gunton explicitly indicates that Lloyd had both Alzheimer's and Dementia.  (See Country Meadows Reply Br., Ex. C.)

Mr. Collins also attempts blatantly to mischaracterize the record to show that Country Meadows staff somehow conspired to cover up the fact that the "cause of [Lloyd's] hospitalization" was actually that he "fell/collapsed."  This is patently contradicted by the record, as evidenced, for example, by the fact that plaintiff's argument hinges entirely on a single stray note on Mr. Lloyd's Emergency Room intake sheet.  In fact, Madeline Velez, Justine Reuben and Betty Jean Gunton consistently describe the event as a collapse related to the other symptoms (vomiting, bruised chest) exhibited by Mr. Lloyd on the morning of September 25, 2004.  Mr. Lloyd's videotaped preliminary hearing testimony also reflects that he did not receive his injury from a fall.  (See Prelim. Hr'g Tr., Christie Mat. Facts, Ex. N, Oct. 12, 2004, 28:7-9.)

---

[17]This allegation severely undermines plaintiff's assertion that Lipare should have mentioned that Mr. Lloyd was diagnosed with Alzheimer's and Dementia in the Affidavit of Probable Cause.  If the nurses withheld information about Mr. Lloyd's condition, Lipare could not possibly have included it.

Plaintiff asserts that Country Meadows may be held liable for malicious prosecution for not timely disclosing Mr. Lloyd's previous x-ray results.  Not only does Mr. Collins fail to establish that these records were even in the possession of Country Meadows, he also finds no basis in law to hold defendant liable for an alleged omission, as opposed to an affirmatively false statement.

In light of the foregoing, I will grant Country Meadows' motion for summary judgment on Count XI.

## V.   CONCLUSION

In light of the foregoing, Defendant Christie's motion for summary judgment is denied.  The summary judgment motions of defendants Lipare and Country Meadows are granted in their entirety.  An appropriate Order follows.

38

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN STERLING COLLINS,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MARILYN L. CHRISTIE,** | : | |
| **executrix of estate of Edwin** | : | **NO. 06-4702** |
| **Lloyd, deceased, et al.,** | : | |
| **Defendants.** | : | |

## <u>O R D E R</u>

**STENGEL, J.**

    **AND NOW**, this 11th day of July, 2008, upon consideration of the motions for summary judgment filed by defendants George M. Leader Family Corp. t/a Country Meadows, Country Meadows Associates, II, LP (Document #77), Louis Scott Lipare (Document #89), and Marilyn L. Christie, executrix of estate of Edwin Lloyd, deceased, (Document #91), it is hereby **ORDERED** that:

    (1)    The motion of defendant George M. Leader Family Corp. t/a Country Meadows, Country Meadows Associates, II, LP (Document #77), is **GRANTED** in its entirety.

    (2)    The motion of Louis Scott Lipare (Document #89) is **GRANTED** in its entirety.

    (3)    The motion of defendant Marilyn L. Christie, executrix of estate of Edwin Lloyd, deceased, is **DENIED**.

BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN STERLING COLLINS,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **George M. Leader Family Corp. t/a** | : | **NO. 06-4702** |
| **Country Meadows, Country** | : | |
| **Meadows Associates, II, LP, and** | : | |
| **Louis Scott Lipare,** | : | |
| **Defendants.** | : | |

## O R D E R   O F   J U D G M E N T

**STENGEL, J.**

**AND NOW**, this 11th day of July, 2008, in accordance with my Order granting the

defendants' motions for summary judgment, and in accordance with Federal Rule of Civil

Procedure 58, judgment is hereby entered on behalf of the defendants George M. Leader

Family Corp. t/a Country Meadows, Country Meadows Associates, II, LP and Louis Scott

Lipare, and against the plaintiff.


BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.